THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:



DATED: January 19, 2016

Beth E. Hanan
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In the matter:

Larry E. Gibas,                          Case No. 15-31102-beh
Kimberly D. Richter Gibas,

    Debtors-in-possession.               Chapter 11

**MEMORANDUM DECISION**

  This chapter 11 case involves two debtors, two houses, eight bankruptcies filed in two states over four years, and no plan payments.

  The debtors-in-possession, Larry and Kimberly Gibas, have filed two motions for stay and the court has issued an order to show cause. Larry Gibas has moved to continue the automatic stay under 11 U.S.C. section 362(c)(3)(B) because he had one previous bankruptcy case dismissed within the past year. Kimberly Gibas has moved to impose the automatic stay under 11 U.S.C. section 362(c)(4)(B) because she had two previous bankruptcy cases dismissed within the past year. The court ordered the Gibases to show cause why they are eligible for bankruptcy relief under Title 11 because they requested and obtained the voluntary dismissal of their last case following the filing of a motion for relief from the automatic stay by one of their creditors, a sequence of events which would render them ineligible under 11 U.S.C. section 109(g)(2).

The court concludes that the text of section 109(g)(2) renders the Gibases ineligible for bankruptcy relief under Title 11 and therefore requires dismissal of this case. Even if the court had confirmed eligibility, a pattern of egregious conduct over the Gibases' multiple bankruptcy filings shows that Larry and Kimberly have not filed this case in good faith, so stay relief would be improper. Finally, and based on the same pattern of repeated filings, late information, concealed information and disregard of a court order, the petitioners[1] will be barred from refiling, singly or jointly, a case under Title 11 for one year from this Decision.

## I. JURISDICTION

This court has jurisdiction under 28 U.S.C. section 1334 and the Eastern District of Wisconsin's July 16, 1984, order of reference entered under 28 U.S.C. section 157(a). This is a core proceeding under 28 U.S.C. section 157(b)(A) and (G), thus the Court may enter final judgment. 28 U.S.C. § 157(b)(1).

## II. PROCEDURAL BACKGROUND

Mr. and Mrs. Gibas filed their current chapter 11 case on October 2, 2015 (the "Chapter 11 Case").[2] Because the couple had previously filed a chapter 13 case in the Eastern District of Wisconsin within the prior year (the "2015 Chapter 13 Case"), their attorney moved to continue the automatic stay under section 362(c)(3). (Chapter 11 Case Doc. No. 6.) Shortly thereafter, the court issued an order to show cause why the petitioners' case should not be dismissed on eligibility grounds, because the Gibases had obtained a voluntary dismissal of their prior case shortly after a creditor moved for relief from the automatic stay. *See* 11 U.S.C. § 109(g)(2). (Chapter 11 Case Doc. No. 15.)

Soon after the order to show cause issued, creditor CIT Bank (formerly OneWest Bank), the holder of the mortgage on the petitioners' prior residence in South Barrington, Illinois, filed an objection to their motion to continue the

---

[1] In this Decision, at least until the conclusion of the analysis of their eligibility to be debtors under the Bankruptcy Code, the court will refer to Mr. and Mrs. Gibas as petitioners. References to their prior bankruptcy cases regard them as debtors.

[2] Unless stated otherwise, citations to the record in this and the Gibases' prior cases are as follows: (1) docket entries in this case, 15-31102, are cited as "Chapter 11 Case Doc. No. __"; (2) docket entries in Northern District of Illinois (N.D. Ill.) bankruptcy case 11-37187 are cited as "2011 Case Doc. No. __"; (3) docket entries in N.D. Ill. bankruptcy case 12-43517 are cited as "2012 Case Doc. No. __"; (4) docket entries in N.D. Ill. bankruptcy case 13-11394 are cited as "First 2013 Case Doc. No. __"; (5) docket entries in N.D. Ill. bankruptcy case 13-29032 are cited as "Second 2013 Case Doc. No. __"; (6) docket entries in N.D. Ill. bankruptcy case 14-18049 are cited as "First 2014 Case Doc. No. __"; (7) docket entries in N.D. Ill. bankruptcy case 14-30601 are cited as "Second 2014 Case Doc. No. __"; and (8) docket entries in Eastern District of Wisconsin bankruptcy case 15-24522 are cited as "2015 Chapter 13 Case Doc. No. __."

stay. (Chapter 11 Case Doc. No. 17.) CIT alleged that the current case was presumptively filed not in good faith because there had not been a substantial change in the Gibases' personal or financial affairs since the dismissal of the prior case. *See* 11 U.S.C. § 362(c)(3)(C)(i)(II). Hours before the October 29, 2015 hearing on the motion to continue stay, CIT filed a supplemental objection, alerting the court to both Larry and Kimberly Gibas's extensive bankruptcy history outside of this jurisdiction. (Chapter 11 Case Doc. No. 21.) That history includes six bankruptcies filed in Illinois since 2011. The couple disclosed none of those prior cases in their petition. CIT also pointed out that the current case marks Kimberly Gibas's third case pending during the year ending on October 2, 2015, and argued that the automatic stay did not go into effect as to her upon filing this case. *See* 11 U.S.C. § 362(c)(4). Minutes before the hearing, CIT and the Gibases filed a stipulation and proposed order granting CIT relief from the stay as to the petitioners' former home and related debt in South Barrington, Illinois. (Chapter 11 Case Doc. No. 22.)

The Gibases did not appear at the hearing on their motion to continue the stay. Their attorney made a brief proffer about the nature of the petitioners' income. Based on that proffer and Larry's affidavit in support of the motion, the court conditionally continued the automatic stay as to Mr. Gibas, pending the conclusion of the hearing on the petitioners' eligibility or further order of the court. (Chapter 11 Case Doc. No. 24.) The court ruled that there was no stay in effect as to Kimberly Gibas because of her prior bankruptcies. (Petitioners' counsel filed a motion to impose the stay on Mrs. Gibas's behalf the following day.) The court advised counsel that his clients should be prepared to testify at their eligibility hearing and should file detailed breakdowns of their business income "well in advance of the hearing," to aid the court in determining the petitioners' good faith. (*Id.*)

On December 1, 2015, the court held a hearing on three matters: (1) the petitioners' eligibility under section 109(g)(2); (2) Larry's motion to continue the stay; and (3) Kimberly's motion to impose the stay.[3] Petitioners' counsel argued that they are eligible for bankruptcy relief under section 109(g)(2), advocating a causal-relationship reading of the statutory provision. He asserted that the petitioners did not dismiss their prior case *because of* the filing of the motion for relief from stay, but rather because they learned that they were financially ineligible for relief under chapter 13. He also argued that Larry and Kimberly filed the present case in good faith and with a valid purpose under the Bankruptcy Code—to pay off their mortgage and tax debts and to save their Fontana, Wisconsin homestead. To support these arguments, counsel offered

---

[3] Several hours before that hearing, the petitioners filed a one-page "Monthly Financial Report," which did not account separately for each of their businesses, and lacked any detail. (Chapter 11 Case Doc. No. 41.)

only the testimony of Larry Gibas. In response, the attorney for the U.S. Trustee elicited testimony from both Larry and Kimberly Gibas. She asserted that the couple's prior filing history demonstrates a pattern of abuse of the Bankruptcy Code and reflects bad faith. She argued the Gibases are not eligible to be debtors under any reading of section 109(g)(2), and urged the court not to continue or impose the stay as to either of them. The court took the matter under advisement. Shortly thereafter, the Gibases' counsel filed a letter of supplemental authority, addressing the *In re Guerrero* decision raised by the court during the hearing. (Chapter 11 Case Doc. No. 44.)

### III.   FACTUAL BACKGROUND

#### A.   Petitioners' Employment

To the extent factual findings are necessary to reach the conclusions set forth in this Decision, the following description of background facts, as well as the factual credibility determinations included in the Discussion portion of the Decision, constitute such findings of fact. *See* Fed. R. Bankr. P. 7052.

According to Schedule I, Mr. Gibas has been employed by Rigger Local 136 for 36 years, and his occupation is an "Iron Worker." (Chapter 11 Case Doc. No. 20 at 19.) Larry Gibas explained that this is a salaried union job in which he sets up equipment for trade shows and conventions. Besides his union employment, Larry also runs his own business, New Beginnings Rental, Inc. (*Id.* at 29.) This business rents cranes and forklifts for use at trade shows and conventions. Mr. Gibas explained that the recent recession affected his income on a delayed basis, because trade shows are often booked (and paid for) several years in advance. He asserted that his income is now improving. (*See* Chapter 11 Case Doc. No. 11.)

Kimberly Gibas is a chiropractor and the owner of New Beginnings Chiropractic, Ltd. (Chapter 11 Case Doc. No. 20 at 19, 29.) Kimberly has been employed at New Beginnings Chiropractic for at least five years.[4]

#### B.   Petitioners' Prior Bankruptcies

Although this is their first chapter 11 case, Mr. and Mrs. Gibas are not new to bankruptcy. Between them, they have filed thirteen bankruptcy cases since 1998. The most recent eight cases, including the current one, have all been filed since September 2011. Six were filed in the Northern District of Illinois, and two in this district. The lengthy but relevant history from those

---

[4] On Schedule I Kimberly states that she has been employed at New Beginnings Chiropractic for five years, but the schedules she filed in prior cases listed her employment duration as three years in 2011, and seven years in 2014. (Chapter 11 Case Doc. No. 20 at 19; 2011 Case Doc. No. 20 at 14; Second 2014 Case Doc. No. 10 at 12.)

eight cases is set forth below. Much of that information was obtained from PACER.[5]

At this point it may be useful to explain how bankruptcy cases are logged on the federal judiciary's electronic filing and indexing systems, CM-ECF and PACER.[6] When a case is filed using the court's electronic filing system, CM-ECF, the national PACER Service Center (PSC) extracts certain data from the filing, including the debtor's social security number. The PSC collects and stores this data for several reasons, including to identify repeat bankruptcy filers. When a debtor files a new case in this district, the debtor's social security number is automatically checked against the social security numbers from prior filings in this district. If a prior filing under the same social security number is found, an automated private docket entry is made notifying the court and the clerk's office that the debtor has filed a prior bankruptcy case. But this automated function of checking for prior cases does not extend to a search of other jurisdictions. To conduct such a broader query, one must search either the national PACER Case Locator index (using the debtor's name), or each district's individual PACER website, one-by-one (using the debtor's name or social security number). Both services require users to pay a fee to access public records. They also rely on accurate social security numbers (when searching individual court websites) and the accurate spelling of a debtor's surname.[7] The bankruptcy system therefore depends on honest and accurate disclosures in the case-initiation process—as in all other stages of a bankruptcy proceeding.

### 1.    The 2011 Case

On September 13, 2011, Kimberly Gibas filed a chapter 13 petition in the Northern District of Illinois, Case No. 11-37187 (the "2011 Case"). With her petition, Mrs. Gibas filed a form disclosing that she had paid her bankruptcy attorney, J. Kevin Benjamin of Benjamin Legal Services, P.L.C., $3,500 prior to

---

[5] In this case, it was creditor CIT's supplemental objection to the motion to continue stay (Chapter 11 Case Doc. No. 21) which alerted the court, and the U.S. Trustee, to the petitioners' prior Illinois cases. Moreover, the court may properly take judicial notice of the filings in the Gibases' prior bankruptcy cases. *See* Fed. R. Evid. 201; Fed. R. Bankr. P. 9017; *Ennenga v. Starns,* 677 F.3d 766, 773–74 (7th Cir. 2012)). "Verified schedules and statements filed by Debtors are not just pleadings, motions or exhibits, they contain evidentiary admissions." *In re Standfield,* 152 B.R. 528, 531 (Bankr. N.D. Ill. 1993).

[6] These acronyms stand for Case Management/Electronic Case Files and Public Access to Court Electronic Records.

[7] For example, Mrs. Gibas has filed bankruptcy cases under the last names Gibas and Richter-Gibas. A search for cases filed by Kimberly Gibas would not turn up cases filed by Kimberly Richter-Gibas. Even typographical errors can frustrate a search. The social security number used for Mrs. Gibas when filing the petition in this case is different than the social security number used in her previous cases. A search using Mrs. Gibas's entered social security number in the Chapter 11 Case would fail to return any results.

filing. (2011 Case Doc. No. 1 at 6.) She did not, however, file any schedules, a statement of financial affairs ("SOFA"), a chapter 13 plan, or a statement of current monthly income (Form B22C) with her petition, so the chapter 13 trustee moved to dismiss her case. (2011 Case Doc. Nos. 9 and 10.) Over a month later, Mrs. Gibas's attorney filed the required documents. (2011 Case Doc. Nos. 17–22.)

On Schedules A and D, Kimberly reported that her primary residence was in South Barrington, Illinois, and was subject to a first mortgage of $882,670 held by Indymac Bank. (2011 Case Doc. No. 20 at 1, 6.) She also disclosed an interest in a second home in Fontana, Wisconsin, which was subject to a first mortgage held by BAC Home Loan Servicing. (*Id.*) In an affidavit filed in a later case, Mrs. Gibas averred that the purpose of the 2011 Case was to "protect" the Fontana property; she explained that she filed the case to attempt to modify the mortgage or to repay arrears on the property. (2012 Case Doc. No. 17-2.)

On Schedule I, Kimberly reported a combined monthly income of $35,239.93, which comprised $32,199.88 from her employment as a chiropractor and $3,040.05 from her husband Larry's (unidentified) employment. (2011 Case Doc. No. 20 at 14.) Her SOFA, however, listed none of her husband's employment income. (2011 Case Doc. No. 21 at 1.)

The section 341 meeting of creditors was scheduled for October 17, 2011. Mrs. Gibas failed to attend. A month later, her attorney moved to reschedule, alleging that Kimberly did not attend the prior meeting because of "the complexity of completing [her] remaining schedules and plan, which have since that date been completed and filed." (2011 Case Doc. No. 23-1.) Her attorney also asserted that Kimberly "is now or will be as of the hearing date of this matter [December 1, 2011] substantially current on her plan payments." (*Id.*) This latter statement proved untrue: In January 2012, the trustee again moved to dismiss the case, on grounds including failure to make plan payments. (2011 Case Doc. No. 45.) On February 9, 2012, the court granted the trustee's motion and dismissed the case. (2011 Case Doc. No. 48.) According to the trustee's final report and account, Mrs. Gibas made no plan payments. (2011 Case Doc. No. 51.)

### 2.    The 2012 Case

On October 31, 2012, Kimberly Gibas filed another chapter 13 petition in the Northern District of Illinois, Case No. 12-43517 (the "2012 Case"). She averred that the purpose of this bankruptcy was to save her Fontana property from a foreclosure sale scheduled to take place the next day. (2012 Case Doc. No. 17-2 at 2.) Two weeks after filing the petition, Kimberly filed her schedules,

SOFA, chapter 13 plan, and Form B22C, with a form disclosing that she had paid her new bankruptcy attorney, Helena Milman of Elan Law Group, $3,219 prior to filing. (2012 Case Doc. Nos. 9–14.)

On Schedule I, Kimberly reported that her combined monthly income was $28,350 and comprised only her business income; she reported no income—either from employment or business—for her husband Larry. (2012 Case Doc. No. 9 at 14.) She listed no income for Larry in her SOFA; the form disclosed only her business income for 2010 and 2012 (but not 2011). (2012 Case Doc. No. 12 at 1.)

In March 2013, the trustee moved to dismiss the case on the ground that Mrs. Gibas had made no plan payments. (2012 Case Doc. No. 33.) The court granted the trustee's motion and dismissed the case on April 4, 2013. (2012 Case Doc. No. 35.) The trustee's final report and account confirmed that Kimberly Gibas had made no plan payments. (2012 Case Doc. No. 38.)

### 3.  The First 2013 Case

On March 21, 2013—shortly after the trustee had moved to dismiss his wife's chapter 13 case—Larry Gibas filed a chapter 13 petition in the Northern District of Illinois, Case No. 13-11394 (the "First 2013 Case"). Mr. Gibas testified that he filed this case to save the couple's home in South Barrington, Illinois. With his petition, Larry filed Schedule D and his chapter 13 plan. (First 2013 Case Doc. No. 1 at 6; First 2013 Case Doc. No. 2.) He reported that he had paid his bankruptcy attorney, David Cutler of Cutler & Associates, Ltd., $970 prior to filing. (First 2013 Case Doc. No. 1 at 7.)

Larry's petition and Schedule D in the First 2013 Case contained several inaccuracies and omissions. On page two, when asked to list all pending bankruptcy cases filed by his spouse, Larry stated, "None." (*Id.* at 2.) On Schedule D, he omitted his interest in the Fontana, Wisconsin property and the corresponding mortgage debt. (*Id.* at 6.) Larry's proposed plan stated that his monthly household income was $0, while his expenses were $14,439, leaving -$14,439 available for plan payments. (First 2013 Case Doc. No. 2 at 1.)

Roughly seven weeks after Larry Gibas filed his petition, the trustee moved to dismiss the case based on Larry's failure to file schedules A through C and E through I, his SOFA, and Form B22C. (First 2013 Case Doc. No. 12.) The court dismissed the case on May 16, 2013. (First 2013 Case Doc. No. 13.) According to the trustee's final report and account, Larry made no chapter 13 plan payments. (First 2013 Case Doc. No. 15.)

### 4. The Second 2013 Case

Two months later, on July 20, 2013, Larry Gibas filed another chapter 13 petition in the Northern District of Illinois, Case No. 13-29032 (the "Second 2013 Case"), through Attorney Cutler. Mr. Gibas testified that he filed this case, like the last case, to save the South Barrington property.[8] With his petition, Larry filed Schedule D, which again omitted the couple's Fontana, Wisconsin property and corresponding debt. (Second 2013 Case Doc. No. 1 at 6.)

Larry filed his remaining schedules and chapter 13 plan two weeks later. Schedule I reported a combined monthly income of $32,437, which included Larry's salary from two jobs, his business income, and Kimberly's business income. (Second 2013 Case Doc. No. 10 at 11.) His SOFA listed his and his wife's 2013 year-to-date business income, but not his employment income or income from prior years. (Second 2013 Case Doc. No. 12 at 1.)

Almost two months after Larry filed his petition, the trustee moved to dismiss on several grounds, including Larry's failure to make plan payments and failure to attend two scheduled section 341 meetings of creditors. (Second 2013 Case Doc. No. 33.) The court dismissed the case on September 25, 2013. (Second 2013 Case Doc. No. 37.) According to the trustee's final report and account, Larry Gibas made no chapter 13 plan payments. (Second 2013 Case Doc. No. 39.)

### 5. The First 2014 Case

On May 13, 2014, Kimberly Gibas filed another chapter 13 petition in the Northern District of Illinois, Case No. 14-18049 (the "First 2014 Case"), and retained Attorney Cutler. Kimberly testified that she filed this case to save the couple's South Barrington home.[9,10] On the second page of her petition, when asked to disclose all previous bankruptcy filings within the last eight years, Kimberly entered "None." (First 2014 Case Doc. No. 1 at 2.) With her petition, Kimberly filed schedules A through E, G, and H. As in her husband Larry's prior two cases, her Schedules A and D omitted their Fontana, Wisconsin home and corresponding debt. (*Id.* at 6, 11.)

The trustee moved to dismiss the case less than a month after it was filed, citing Mrs. Gibas's failure to file her remaining schedules, her chapter 13 plan, and Form B22C. (First 2014 Case Doc. No. 9.) The court dismissed the

---

[8] Larry Gibas did not offer testimony until the present case. Some of that testimony addressed aspects of his and his wife's prior bankruptcy cases.

[9] Mrs. Gibas did not testify in or appear at any of her bankruptcy cases until this one. She could not recall meeting with a trustee, although she apparently did so, once.

[10] Larry testified at the December 1, 2015 hearing that the couple had moved out of their South Barrington home to Fontana in October 2013. (Chapter 11 Case Doc. No. 43.)

case on June 19, 2014. (First 2014 Case Doc. No. 10.) According to the trustee's final report and account, Mrs. Gibas made no chapter 13 plan payments during the case. (First 2014 Case Doc. No. 12.)

### 6. The Second 2014 Case

Two months later, on August 20, 2014, Kimberly Gibas filed yet another chapter 13 petition in the Northern District of Illinois, Case No. 14-30601 (the "Second 2014 Case"), also through attorney David Cutler. As in her First 2014 Case, her petition and schedules contained several inaccuracies and omissions. For example: the petition failed to disclose that Kimberly Gibas had previously filed the 2011 Case or 2012 Case (Second 2014 Case Doc. No. 1 at 2); Schedules A and D failed to disclose her interest in their Fontana home (Second 2014 Case Doc. No. 10 at 1, 6); and Schedule F listed no unsecured debt, even though the schedules in the 2011 Case and 2012 Case (and this case) reported that Kimberly has unsecured student loan debts totaling over $230,000 (*Id.* at 9; 2011 Case Doc. No. 20 at 9; 2012 Case Doc. No. 9 at 10; Chapter 11 Case Doc. No. 20 at 15).

On September 30, 2014, OneWest Bank, the mortgage holder for the couple's South Barrington property, moved to dismiss the case and to bar Mrs. Gibas from refiling future bankruptcies for 180 days, or for relief from the automatic stay and the codebtor stay. (Second 2014 Case Doc. No. 25.) On October 22, 2014, the court granted OneWest's request for stay relief. (Second 2014 Case Doc. Nos. 43–44.) The court also granted OneWest's request for a refiling bar, ordering that Kimberly would be "barred for a period of 180 days from again seeking protection under the US Bankruptcy Code" if her case was dismissed. (Second 2014 Case Doc. No. 43.) After obtaining relief from the automatic stay, OneWest Bank sold the South Barrington house at a sheriff's sale in December 2014. (*See* Chapter 11 Case Doc. No. 22 at 2.) As of the filing of this Chapter 11 case, that sale has not yet been confirmed by the Illinois state court.

In December 2014, the trustee moved to dismiss Mrs. Gibas's case on several grounds, including her failure to make plan payments and failure to attend two scheduled 341 meetings of creditors. (Second 2014 Case Doc. No. 48.) The court dismissed the case on January 5, 2015. (Second 2014 Case Doc. No. 49.) On that same day, the court issued an order allowing compensation for Attorney Cutler of $4,310. (Second 2014 Case Doc. No. 50.) According to the trustee's final report and account, Kimberly Gibas made no chapter 13 plan payments. (Second 2014 Case Doc. No. 52.)

### 7. The 2015 Chapter 13 Case

On April 23, 2015, a little over three months after the Second 2014 Case was dismissed, Mr. and Mrs. Gibas filed a joint chapter 13 case in the Eastern District of Wisconsin, Case No. 15-24522 (the "2015 Chapter 13 Case"). Notably, the case was filed within the 180-day "bar" period applicable to Kimberly Gibas, which would have expired after July 6, 2015. But because Kimberly Gibas did not disclose the Second 2014 Case on their petition, and because her prior case fell outside of PACER's automatic filing history search parameters, the Eastern District of Wisconsin bankruptcy court was unaware of the Second 2014 Case and the bar order.

Mr. and Mrs. Gibas assert that they filed the 2015 Chapter 13 case to save their Fontana home, which they had made their primary residence after agreeing that they could not save their South Barrington property. (*See* Chapter 11 Case Doc. No. 11.) Larry testified they had moved from Illinois to Wisconsin in October, 2013. (Chapter 11 Case Doc. No. 43.) In their petition, the couple reported that they paid their new bankruptcy lawyer, Jennifer Riemer of Thorpe & Christian, S.C., $3,500 prior to filing. (2015 Chapter 13 Case Doc. No. 1 at 35.) Larry Gibas testified that they later paid Attorney Riemer another $3,500. The couple did not disclose any of their previous six Illinois bankruptcies on their petition, instead reporting they had filed "None." (*Id.* at 2.) The couple failed to disclose their interest in the South Barrington property on either Schedules A and D or their SOFA. (*Id.* at 10, 17, 29.) Their SOFA did not report business income for either Larry or Kimberly. (*Id.* at 27.)

Schedule I reported a combined monthly income of $13,181.63, which included Larry's salary and Kimberly's business income, but no business income for Larry. (*Id.* at 23.) Form 22C-1 also omitted Larry's business income. (*Id.* at 41.)[11] Their proposed chapter 13 plan required them to make direct post-petition mortgage payments on their Fontana home to Nationstar Mortgage, the loan servicer for U.S. Bank (the current holder of the mortgage on the Fontana property). (2015 Chapter 13 Case Doc. No. 2 at 4.)

The section 341 meeting of creditors was scheduled for May 20, 2015. Neither Larry nor Kimberly appeared. The chapter 13 trustee moved to dismiss the case. (2015 Chapter 13 Case Doc. No. 11.) Their attorney objected, contending that her clients had "missed the § 341 meeting due to excusable

---

[11] Filings in this case report Larry Gibas's 2015 YTD business income as $50,000. (*See* SOFA, Chapter 11 Case Doc. No. 20 at 24.) Form 22B reflects that he earned $30,000 of that amount in the six months prior to filing (i.e., from April to October 2015). (*Id.* at 32.) According to these figures, Larry earned $20,000 in business income between January and March, 2015. That amount should have been, but was not, reported on the SOFA and Form 22C-1 filed in the couple's 2015 Chapter 13 Case.

neglect." (2015 Chapter 13 Case Doc. No. 14.) Attorney Riemer also asserted that Mr. and Mrs. Gibas's "[p]ost-petition mortgage payments are current to date [June 11, 2015]." (*Id.*) The trustee's motion was resolved via a stipulation, which reset the meeting of creditors for July 22, 2015, and included a six-month doomsday provision on payments beginning in July 2015. (2015 Chapter 13 Case Doc. No. 23.)

On July 14, 2015, U.S. Bank moved for relief from the automatic stay as to the Fontana property. (2015 Chapter 13 Case Doc. No. 26.) Attached to the motion is a Nationstar Mortgage affidavit averring that Larry and Kimberly Gibas had failed to make post-petition mortgage payments for the months of May, June, and July of 2015, totaling $5,737.26. (2015 Chapter 13 Case Doc. No. 26-2.) This sworn statement conflicts with Attorney Riemer's representation that the couple were "current" on their post-petition mortgage payments.

Late on that same day—6.5 hours after U.S. Bank filed its motion for relief from the stay—the Gibases requested to dismiss their case. In a one-page notice of voluntary dismissal, the couple offered only that they "elect[ed] not to pursue bankruptcy relief at this time." (2015 Chapter 13 Case Doc. No. 27.) Later, in this court, the Gibases maintained that they had requested dismissal because they discovered that the December 2014 sheriff's sale of their South Barrington property had not been confirmed. This meant they were over the debt limit for chapter 13 relief, and needed to pursue bankruptcy relief under chapter 11. (Chapter 11 Case Doc. No. 11.) Larry Gibas testified that Attorney Riemer was not comfortable handling a chapter 11 case, and advised them to voluntarily dismiss the 2015 Chapter 13 case. He also testified he was unaware that U.S. Bank had moved for relief from stay when he and his wife sought dismissal. Neither petitioner offered any evidence or testimony to establish precisely when they discovered that they were over the debt limit for chapter 13 relief, when they authorized Attorney Riemer to file their dismissal request, or even when they told Attorney Riemer about their South Barrington home.

The joint case was dismissed on July 20, 2015. (2015 Chapter 13 Case Doc. No. 28.) According to the trustee's final report and account, Larry and Kimberly made no chapter 13 plan payments during the case. (2015 Chapter 13 Case Doc. No. 30.)

### 8. The 2015 Chapter 11 Case

Mr. and Mrs. Gibas did not immediately file a chapter 11 case upon dismissing their chapter 13 case in July. Instead, they waited to file this case until October 2, 2015. The petitioners assert that they filed this case, like the last one, to save their homestead in Fontana. (*See, e.g.,* Chapter 11 Case Doc. No. 11.) According to Larry, the case was filed "on an expedited basis" after Attorney Riemer called to inform them that the date of the confirmation of the

sheriff's sale on the Fontana property had been moved up from October 16, 2015 to October 6, 2015. (*See* Chapter 11 Case Doc. No. 14.) Larry was out of town on business, so he telephoned Attorney Leonard Leverson, whom he then engaged and sent a retainer fee of $10,000. (*See* Chapter 11 Case Doc. No. 13.) Larry testified that Attorney Riemer provided Attorney Leverson with all of the paperwork from the couple's prior case, and that Attorney Leverson filed this case to stop the confirmation of the sheriff's sale in Fontana. The case was filed without supplying Schedules A-J, the SOFA, Form 22B, Summary of Schedules or the Statistical Summary. Two weeks later the petitioners requested a further extension, offering that they needed additional time to prepare their schedules due to the rigors of their work schedules. (Chapter 11 Case Doc. No. 14.)

The current petition omits mention of Larry and Kimberly's prior Illinois bankruptcies. (Chapter 11 Case Doc. No. 1 at 2.) Schedule I, filed almost a month later, reports that Larry receives $3,791.22 in take-home pay from his union job, as well as $5,000 in business income, while Kimberly receives $7,000 in business income, totaling a combined income of $15,791.22. (Chapter 11 Case Doc. No. 20 at 20.) Form 22B calculates the couple's average monthly income as $20,275.83, which comprises $8,275.83 from Larry's wages, $5,000 from Larry's business income, and $7,000 from Kimberly's business income. (*Id.* at 32–33.) Schedule J reports expenses of $8,575.40 and NMI of $7,215.82. (*Id.* at 22.)

On Schedule D, the couple list secured claims totaling $1,816,556.74, which include a mortgage and real estate taxes on the South Barrington property; a mortgage and real estate taxes on their Fontana homestead; a loan for a 2007 Cobalt boat; and an IRS claim on all property (for "2004, 2006, 2008, 2012 income taxes and 2008 and 2010 civil penalty"). Larry and Kimberly assert that the unsecured portions of these claims total $748,212.46. (*Id.* at 10–11.) Schedule E lists a priority debt of $203,114.17 owed to the IRS for 2010, 2011, and 2014 income taxes, which the couple labels as "disputed." (*Id.* at 13.) Larry testified that he and his wife can pay off the debt in full over five years because his income has improved, he can "work with" his mortgage lender, and he can provide the IRS with information that may reduce its claim. Schedule F lists unsecured debts totaling $384,325.38 for Kimberly's student loans, an IRS claim, and a lease on a 2015 Cadillac Escalade. (*Id.* at 15–16.)

Larry acknowledged that he and his wife don't have a great "track record" as debtors, but testified that the current case is different because they have gotten rid of what they cannot afford, are living in a more modest house, and can pay back their taxes and the mortgage on their current homestead.

After the hearing on these issues, but before release of the court's Decision, the U.S. Trustee filed a motion to dismiss this case for cause under

11 U.S.C. section 1112(b)(4) and for a one-year bar from refiling under 11 U.S.C. section 349. (Chapter 11 Case Doc. No. 54.) This Decision moots that motion.

<h1 style="text-align:center">IV.   DISCUSSION</h1>

## A.   A Pattern of Incomplete and Inaccurate Petitions and Schedules

In each of their bankruptcy cases, including the current one, Larry and Kimberly Gibas signed declarations under penalty of perjury averring that they had reviewed their petitions and schedules, and that the information contained therein was true and correct. During the hearing, however, the couple gave testimony in direct conflict with their prior sworn statements. Kimberly testified that she did not fill out or review the petitions and schedules in her Illinois bankruptcy cases, even though she signed them. She explained that her husband "normally" handled all the paperwork, and that she routinely signed whatever bankruptcy documents he handed her, without question. She expressed surprise at the number of prior bankruptcy cases she had filed.

Larry Gibas likewise testified that he did "not really" review the schedules he filed in his prior Illinois cases, even though he signed them under penalty of perjury. Larry said he relied on his various attorneys to "do him justice" and to ensure that his schedules were complete and accurate, commenting, "You hire an attorney to protect you, correct?"

Larry also testified that he did not review the schedules filed in the 2015 Chapter 13 Case before signing them (although Kimberly did). He justified his cursory glance by stating, "You have to have faith in your attorney." Often Larry attempted to deflect the blame for the inaccuracies in his 2015 Chapter 13 Case schedules onto Attorney Riemer, suggesting that any omissions were due to her failure to ask him certain questions, rather than his own failure to ensure accuracy. He pointed out that he did not fill out the schedules; instead, Attorney Riemer sent him an email requesting information and other items she needed to file their case, which he provided to her. When asked why he did not include the South Barrington property on Schedules A and D or the SOFA, Larry testified that he assumed it was because he told Attorney Riemer that the South Barrington property was "gone," meaning that he and Kimberly didn't own it anymore because it had been sold at a sheriff's sale. Larry admitted he noticed that the SOFA did not list the South Barrington home as a foreclosure, but he failed to point out the omission to Attorney Riemer and did not read the requirements regarding what to disclose. Larry conceded that he did not disclose the couple's six prior Illinois bankruptcies on the petition—but

admitted that they should have been disclosed—because, he said, he did not know he had to, and because Attorney Riemer never asked him.[12]

Larry and Kimberly Gibas cannot escape their duty to fully and accurately prepare their bankruptcy petition and schedules by pointing fingers at their various attorneys. Upon filing for bankruptcy, a debtor incurs an affirmative duty to fully disclose "all assets and liabilities and to answer all questions pertaining to his/her financial affairs fully and with the utmost candor." *In re Jakovljevic-Ostojic*, 517 B.R. 119, 126–27 (Bankr. N.D. Ill. 2014) (*quoting Carto v. Oakley* (*In re Oakley*), 503 B.R. 407, 424 (Bankr. E.D. Pa. 2013)) (internal quotations omitted). A debtor must attest that he or she has reviewed the bankruptcy petitions, schedules, and statements, and that the information contained therein is correct. *See* Fed. R. Bankr. P. 1008 ("All petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746."). Here, the Gibases' ostrich defense does not fly: "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." *In re Tully*, 818 F.2d 106, 111 (1st Cir. 1987) (rejecting the debtor's "reliance upon counsel" defense and affirming the denial of his chapter 7 discharge under section 727(a)(4)(A) for making a false statement under oath by omitting assets from his schedules). As the First Circuit noted in *Tully*: "Sworn statements filed in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if debtors are not forthcoming." *Id.* at 112; *see also AT&T Universal Card Servs. Corp. v. Duplante* (*In re Duplante*), 215 B.R. 444, 447 n. 8 (B.A.P. 9th Cir. 1997) ("Schedules and statements of financial affairs are sworn statements, signed by debtors under penalty of perjury. Adopting a cavalier attitude toward the accuracy of the schedules and expecting the court and creditors to ferret out the truth is not acceptable conduct by debtors or their counsel.").

Based on the record, the court concludes that Larry and Kimberly Gibas do not regard bankruptcy as "serious business." Their multiple bankruptcy cases manifest a pattern of late-filed information, missing or concealed information, inconsistent information, and repeated failure to attend section 341 meetings. The petitioners' testimony in this court only reinforces this conclusion.

Kimberly Gibas's testimony depicts a "file it and forget it" mentality toward her prior cases. She testified that she did not recall meeting with a

---

[12] According to Larry, this is also why the current petition suffers from the same defect. Mr. Gibas explained that he did not disclose his Illinois bankruptcies to his current attorney because the petition was filed quickly based on the now-admittedly inaccurate information that Attorney Riemer forwarded to Attorney Leverson.

chapter 13 trustee in any case she filed after 2003. She also never met with her attorney or appeared in court. The court finds her testimony that she read none of the mail she received concerning her bankruptcy cases (including the order that barred her from refiling bankruptcy for 180 days) as stunning and incredible.

As for Larry Gibas, his testimony demonstrated a deliberate pattern of using the bankruptcy process for reasons other than its intended purpose of repaying secured creditors. He testified that the couple paid their various bankruptcy attorneys close to $20,000 during the past year alone, but Larry did not recall ever making a plan payment in any prior chapter 13 case. His description of the couple's prior cases depicts a continuous loop of creditor avoidance: (1) one of them would file for bankruptcy; (2) the couple would try to work out a loan modification with a bank; (3) the petitioner-Gibas would allow the bankruptcy case to be dismissed because the loan modification was going forward; and (4) when the attempted modification fell through, one of them would refile for bankruptcy to prevent a sheriff's sale. These petitioners treat bankruptcy filings as fungible stop-gap measures to forestall imminent foreclosure action, rather than sincere efforts to maintain primary assets while repaying creditors through a plan of reorganization.

The facts also suggest that the petitioners not only concealed information from the courts, but from their counsel. Attorney Cutler represented Larry or Kimberly Gibas in their 2013 and 2014 cases. Ownership of the Fontana property, and corresponding debt, was never disclosed in those four cases, whose stated purpose was to protect the South Barrington home. Only when the petitioners' purpose was to protect their Fontana property did they disclose that additional ownership and debt, but then with the aid of lawyers other than Mr. Cutler.

## B.   Effect of Kimberly Gibas's Violation of the Bar Order from the Second 2014 Case

In Mrs. Gibas's Second 2014 Case, the Illinois court denied a creditor's motion to dismiss, but entered an order barring Kimberly from filing another case within 180 days of any dismissal. Kimberly's case ultimately was dismissed on January 5, 2015, upon the trustee's motion, at which point the 180-day period began to run. Notwithstanding that bar order, Kimberly, with her husband Larry, filed their joint chapter 13 case on April 23, 2015. That date was 183 days after the Illinois bankruptcy court had entered the bar order, but only 108 days since the 180-day bar went into effect (from the January 5, 2015 dismissal). Kimberly violated the bar order when she became a joint debtor in the 2015 Chapter 13 Case filed in the Eastern District of Wisconsin.

Had the bankruptcy court in the 2015 Chapter 13 Case known of the Illinois bar order, it likely would have dismissed the 2015 Chapter 13 Case, at least as to Kimberly, or imposed other sanctions. *See* Fed. R. Bankr. P. 9011; *Moran v. Frisard* (*In re Ulmer*), 19 F.3d 234, 235 n.5, 238 (5th Cir. 1994). But a debtor's bankruptcy filings outside of this jurisdiction do not appear on the docket as part of the automated post-filing search process designed to identify prior cases. Short of someone, like the trustee or a creditor, undertaking a national PACER search, for which a fee is charged, the court can rely on only the sworn statements of the debtor herself. In the 2015 Chapter 13 Case, Kimberly supplied false information, while swearing to its accuracy under penalty of perjury. (*See* 2015 Chapter 13 Case Doc. No. 1 at 3, 26.)

Accepting that Kimberly Gibas violated the Illinois bar order when she jointly filed the 2015 Chapter 13 Case, the question arises as to the effect of that violation in this case. Courts in this circuit and elsewhere recognize that the 180-day period prescribed by section 109(g)(2) is tolled during the pendency of a case filed in violation of the section. *In re Wilson*, 85 B.R. 72, 73 (Bankr. N.D. Ill. 1988); *In re Moody*, 336 B.R. 876, 880 (S.D. Ga. 2005). Here, the Second 2014 Case was dismissed on January 5, 2015. One hundred eight (108) days later, Kimberly and Larry filed their joint case in Wisconsin. Analogizing to *Moody, et al.*, the filing of the joint case—in violation of the bar— tolls the 180-day period. The Gibases voluntarily dismissed their 2015 Chapter 13 Case on July 20, 2015. Resuming the clock on the bar period, Kimberly waited until October 2, 2015 to file this chapter 11 case with her husband. October 2 is the 182nd day since the Second 2014 Case was dismissed. The Illinois bar order no longer has direct prohibitive effect for Kimberly. But Larry and Kimberly's entire filing history, including the reason for the bar order and their failure to disclose it, are inescapably relevant to their motions for continuation and imposition of the automatic stay, and to the court's basis for sanctions, as discussed below.

## C.    **Larry and Kimberly Gibas Are Not Eligible to Be Debtors**

To avail oneself of bankruptcy relief under Title 11, a person must qualify to be a debtor under section 109. One provision governing eligibility under section 109 relates to past acts taken by a debtor in a previously dismissed case. *See* 11 U.S.C. § 109(g). Relevant here is subsection (g)(2), which states:

> [N]o individual . . . may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if . . . (2) the debtor requested and obtained the voluntary dismissal of the case *following* the filing of a request for relief from the automatic stay provided by section 362 of this title.

11 U.S.C. § 109(g)(2) (emphasis added).

Section 109(g)(2) renders a person ineligible for bankruptcy relief where five conditions are met: (i) the person is an individual, (ii) the person was a debtor in a previous bankruptcy case, (iii) a party filed a request for relief from the automatic stay in the previous case, (iv) the person requested and obtained a voluntary dismissal of the previous case *following* the party's request for relief under section 362, and (v) the voluntary dismissal in the previous case occurred within 180 days of the petition date in the person's present case. Four out of the five conditions are met here. The sole legal question is whether the petitioners satisfy the fourth condition.

Since its enactment in 1984, courts and academics have struggled with how to interpret section 109(g)(2), and in particular, the term "following." *See* Harry Wright IV, Comment, *Must Courts Apply Section 109(g)(2) When Debtors Intend No Abuse in an Earlier Dismissal of Their Case?*, 7 BANKR. DEV. J. 103 (1990); Ned W. Waxman, *Judicial Follies: Ignoring the Plain Meaning of Bankruptcy Code § 109(g)(2)*, 48 ARIZ. L. REV. 149 (Spring 2006). Three primary interpretive approaches have emerged. None stands as the majority view, and the Seventh Circuit has yet to take up the question.

The first approach holds that the term "following" means "after," and requires only that the events identified in section 109(g)(2) occur sequentially. *See, e.g., In re Andersson*, 209 B.R. 76 (B.A.P. 6th Cir. 1997); *In re Richardson*, 217 B.R. 479 (Bankr. M.D. La. 1998); *In re Munkwitz*, 235 B.R. 766 (E.D. Pa. 1999); *In re Guerrero*, 540 B.R. 270 (Bankr. S.D. Tex. 2015); *see also In re Payton*, 481 B.R. 460, 463 (Bankr. N.D. Ill. 2012) (recognizing that "most . . . decisions agree . . . that 'following' in § 109(g)(2) means only 'subsequent to,'" but declining to adopt a mandatory application). Under the sequential approach, if a debtor requests and obtains a voluntary dismissal of her case after a party moves for relief from stay, that person is not eligible for bankruptcy relief for 180 days after case dismissal, and no further inquiry is needed. Under this view, Congress already has, at least implicitly, made the policy determination that in most instances the voluntary dismissal (and later refiling) are related to the prior request for stay relief, and that a mandatory 180-day window between the debtor's bankruptcy cases appropriately prevents debtor abuse and allows creditors to pursue state court remedies. *See In re Nelkovski*, 46 B.R. 542, 544 (Bankr. N.D. Ill. 1985) (noting that "Congress intended to formulate a so-called bright line rule which would preclude certain debtors from refiling within 180 days."); *see also,* 5 Collier On Bankruptcy ¶ 1300.12[10] at 1300-49 (15th ed. 1987) ("[s]ince the purpose of this provision was to prevent the abusive filing of new petitions close on the heels of legitimate requests for relief from the automatic stay, the language prohibiting a new case 'following' a request for relief from the stay probably implies causal relationship between the two.").

The second approach holds that the term "following" means "as a result of" and requires a judicial determination of a causal relationship between two of the actions referenced in section 109(g)(2). *See, e.g., In re Payton*, 481 B.R. 460, 461 (Bankr. N.D. Ill. 2012); *In re Duncan*, 182 B.R. 156 (Bankr. W.D. Va. 1995); *In re Copman*, 161 B.R. 821 (Bankr. E.D. Mo. 1993). Under the causal approach, if a debtor requests and obtains a voluntary dismissal of her case after a party moves for relief from stay, that person is ineligible for bankruptcy relief for 180 days only if the court determines she requested and obtained the voluntary dismissal *because of* the party's motion for relief from stay.

The third approach endorses the sequential interpretation of "following," but would limit application of section 109(g)(2) to those cases where the voluntary dismissal and refiling constitute an abuse of the bankruptcy process. Courts adopting the discretionary approach have identified several exceptions to the 180-day prohibition: (1) if the person acts in good faith in refiling, after she has requested and obtained a voluntary dismissal of her prior case subsequent to the filing of a motion for relief from stay, *In re Luna*, 122 B.R. 575, 577 (B.A.P. 9th Cir. 1991); (2) if the person shows that no prejudice will occur to the party who moved for relief in the previous case, *In re Howard*, 311 B.R. 230, 232 (Bankr. E.D. Wis. 2004); or (3) if the motion for relief from stay was withdrawn, dismissed, or denied, *In re Beal*, 347 B.R. 87, 93 (E.D. Wis. 2006).

Applying long-standing rules of interpretation, the court ultimately concludes the sequential approach best fulfills the statutory purpose.

## 1.     Statutory Interpretation of Section 109(g)(2)

Statutory interpretation begins with determining whether the text at issue "has a plain and unambiguous meaning with regard to a particular dispute." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *River Road Hotel Partners, LLC v. Amalgamated Bank (In re River Road Hotel Partners, LLC)*, 651 F.3d 642, 649 (7th Cir. 2011). When the language is plain, "the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004). The meaning of a term "depends upon reading the whole statutory text, considering the purpose and the context of the statute, and consulting precedents or authorities that inform that analysis." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011); *River Road*, 651 F.3d at 649. If the language is found unambiguous, the court ends its inquiry and will enforce the statute in accordance with its plain meaning. *River Road*, 651 F.3d at 649.

Our Supreme Court cautions that while courts may disagree on whether a statute is ambiguous, judicial disagreement does not itself create ambiguity. *Moskal v. United States*, 498 U.S. 103, 108 (1990). The Seventh Circuit

counsels that "statutory language is the most reliable indicator of congressional intent," *McDougall v. Bell Transit Co.*, 22 F.3d 706, 710 (7th Cir. 1994), but also accepts that if reasonable minds can differ on the interpretation of a statute, it does not have a single plain meaning, and the court must determine which understanding is superior, *River Road*, 651 F.3d at 650–51 (comparing two plausible judicial interpretations).

Here, the term "following" is susceptible of discrete but reasonable meanings, whether by looking to dictionary definitions or reviewing competing judicial views. *See, e.g.*, *Richardson*, 217 B.R. at 484, 486–87 (concluding that "following" encompasses both "after" and "because of" by checking definitions in multiple dictionaries, but concluding that the ordinary, primary meaning is "after"); *Payton*, 481 B.R. at 465 ("Both usage and dictionary definitions, then, demonstrate . . . there is no single meaning that can be assigned to 'following' in a modifying phrase."). The *River Road* court, interpreting a cramdown provision in section 1129(b)(2)(A), found that provision ripe for multiple interpretations in part because the text itself did not "directly indicate[] whether subsection (iii) can be used to confirm any type of plan or if it can only be used to confirm plans that propose disposing of assets in ways that can be distinguished from those covered by [other subsections]." 651 F.3d at 650. Likewise, the text of section 109(g)(2) offers no modifier to specify that the 180-day window must be observed in *all* instances where a voluntary dismissal was preceded by the filing of a motion for relief from stay, or only where the court makes an evidentiary determination that the voluntary dismissal was a result of the filing of the motion for relief. In short, the term "following" as used in section 109(g)(2) does not have a single, plain meaning.

On to the next step—determining which understanding is superior. Courts favor interpretations that make each of the statute's parts meaningful and further the objectives of the larger statutory scheme. *River Road*, 651 F.3d at 651 (*citing to TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001), and *United Sav. Ass'n of Tex. v. Timbers Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)). An important limitation is that courts may not add or eliminate words from the actual text chosen by Congress. *GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 624–25 (7th Cir. 2013). With these principles in mind, the court examines each of the three interpretive approaches to the word "following" below.

### a. The best reading of the word "following" in section 109(g)(2) is after.

First, we consider all parts of the text itself. As noted above, "following" is unqualified. That suggests Congress meant section 109(g)(2) to apply without exceptions, as long as each of its express conditions are met. *GE Betz*, 718 F.3d at 624–25.

Second, the voluntary dismissal referenced in section 109(g)(2) is a right available to a chapter 13 debtor "at any time" if the case has not already been converted. 11 U.S.C. § 1307(b). With limited exception, the court *shall dismiss* a case under this chapter, and subsection 1307(b) commands that "Any waiver of the right to dismiss under this subsection is unenforceable." *See In re Youngblood*, No. 13-71071, 2013 WL 5592904, at *7 (Bankr. C.D. Ill. Oct. 10, 2013) (discussing bad faith exception to right of dismissal under 11 U.S.C. section 1307(b)). This right to obtain dismissal—essentially at will—is a strategic tool for debtors. It is reasonable to conclude that Congress recognized that when a debtor chooses to use that tool to dismiss his case after a motion for relief has been filed, and then later files a new case, the debtor has calculated that dismissal and refiling benefit him more than continuing the first case or waiting for the trustee or creditor to file a motion to dismiss. Conversely, section 109(g)(2) is a tool for creditors. Creditors can assess the benefit of filing a motion for relief from stay—which might gain them individual relief or which might prompt voluntary dismissal but create a 180-day bar to refiling—versus filing their own motion to dismiss which, if successful, would lift the stay for all creditors, but not erect a 180-day bar to refiling. Reading "following" simply as a sequential directive permits both debtors and creditors to make strategic decisions without requiring an evidentiary hearing on causal relationship.

Third, within the same eligibility section, Congress later created section 109(h). That provision renders a person ineligible to obtain bankruptcy relief if he or she fails to file a certificate verifying completion of a credit counseling session within 180 days before the petition was filed. Congress devised two express exceptions to the effect of section 109(h). But section 109(g)(2), in contrast, includes no express exceptions. The inclusion of exceptions in one eligibility subsection, but not in section 109(g)(2), strongly suggests that Congress meant section 109(g)(2) to apply as written.

In choosing an interpretation that furthers the larger statutory scheme, the court also consults the provision's purpose. Absent an express statement of purpose within the text itself, the court may consult legislative history. Here, the available legislative history is clear as to purpose, but less clear as to means, and so the consultation is measured. *Lamie v. U.S. Trustee*, 540 U.S. at 541–42 (competing interpretations of legislative history make it difficult to have confidence in which interpretation is closer to congressional intent). The *Richardson* court gathered all of the available legislative history, set forth below.

Section 109(g)(2) was part of The Bankruptcy Amendments and Federal Judgeship Act of 1984. Pub. L. No. 198-353, 98 Stat. 333 (1984). The Senate Report accompanying Senate Bill 445, Omnibus Bankruptcy Improvements Act

of 1983, the forerunner to the Bankruptcy Amendments Act of 1984, found at S. Rep. 65, 98th Cong., 1st Sess. 74 (1983), offers a brief statement of purpose:

> Subsection (f) [now g] adds a new paragraph to section 109. The purpose of the new paragraph is to provide the court with greater authority to control abusive multiple filings. The section as amended will prohibit any party from filing a petition who, within the previous six months, has had a previous petition dismissed for failure to abide by orders of the court or upon voluntary motion for dismissal.

The *Richardson* court assessed the utility of the Senate report to our inquiry: The reference to "greater authority" suggests a grant of discretion, but the unambiguous verb form in the second sentence "will prohibit" appears mandatory. Unfortunately, that sentence is incomplete, as it does not include the prerequisite of a motion for relief from stay before the second event, "voluntary motion for dismissal." 217 B.R. at 488 n.15; *but see Lamie*, 540 U.S. at 534 (instructing that even awkward or ungrammatical language does not necessarily obscure a statute's meaning).

Another piece of the legislative history is academic testimony presented to the Senate Judiciary committee before section 109(g)(2) was enacted. Bankruptcy law Professor Frank Kennedy testified that he and Professor Vern Countryman held the view that section 109(g)(2) was not needed, and that courts already had "ample powers to dismiss or abstain . . . . It is better for the courts to deal with the kinds of situations proscribed by the statute under existing authority than to impose a flat proscription as the proposed amendment does." *Bankruptcy Improvements Act: Hearing on S. 445 and S. 333 Before the S. Comm. on the Judiciary*, 98th Cong 326 (1983), cited at 217 B.R. at 488 n.15. These professors opposed enactment of the statute, reading it to create a "flat proscription." The professors' opposition did not prevail.

In sum, the contemporaneous legislative history of section 109(g)(2) identifies its purpose—greater authority to control abusive filings—and tends to indicate a mandatory application by the characterizations "will prohibit," and to a lesser extent, "flat proscription." Another indicator favoring the mandatory view is that when Congress next made broad changes to the Code, as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), it left section 109(g)(2) alone. Congress retained section 109(g)(2) unchanged despite the split in judicial interpretations. But as part of the BAPCPA amendments, Congress did make two eligibility-related changes. It added section 109(h) which requires an individual debtor to receive a briefing from an approved nonprofit budget and credit counseling agency within 180 days before filing a bankruptcy petition; and it amended section 109(b)(3)

concerning the eligibility of foreign insurance companies and banks. Leaving the text of section 109(g)(2) as originally drafted, while making changes on its periphery, suggests some legislative acquiescence to preceding judicial interpretation. *See Bob Jones University v. U.S.* 461 U.S. 574, 600 (1982). While that interpretive doctrine is short of a command, persistent maintenance of the original text, in the face of other eligibility changes, strongly suggests that Congress meant "following" in the mandatory, chronological, unqualified sense.

### b. The causal-relationship approach improperly adds words to the text of section 109(g)(2).

Mr. and Mrs. Gibas contend that the causal approach—reading "following" to mean "as a result of"—yields the best application of section 109(g)(2). (Chapter 11 Case Doc. No. 33 at 1.) In their view, the causal approach best serves the Congressional purpose of section 109(g)(2), while avoiding harsh results sometimes produced by the sequential approach. (*Id.* at 3–7.) The Petitioners rely primarily upon *Payton.*

The *Payton* court concluded that the most reasonable meaning of "following" was "as a result of" because the term "following" links two discrete events—(1) filing a motion for relief under section 362 and (2) the request for and voluntary dismissal of the debtor's case. *Payton*, 481 B.R. at 465–66. The *Payton* court devised examples of when merely chronological uses of "following" are rendered unintelligible when discrete events, not causally related, are linked by the preposition "following." *Id.* at 464 n.2, 465–66. It then reasoned that whenever discrete events are linked by the term "following," a causal relationship is most likely. *Id.* at 465–66. From that, *Payton* concluded that courts should not deem the debtor ineligible to refile for 180 days unless the court found a causal relationship between the motion for relief and the requested voluntary dismissal. *Id.*

*Payton* essentially takes a risk-avoidance approach, requiring a judicial determination of causal relationship before a court can impose the 180-day bar. *Payton's* error is not its conclusion that "following" can have a causal meaning in addition to connoting a sequential order, but its perception that Congress intended courts to undertake a mind-of-the-debtor inquiry for every challenge under section 109(g)(2). *Payton* creates more work than Congress intended. The use of "following" without qualification, combined with the accepted statutory purpose to use section 109(g)(2) as one weapon against abusive filings, supports a legislative determination that, more often than not, there is a causal relationship between the two events. The second event, the debtor's request for voluntary dismissal, is an event under the control of the debtor. Balanced against that right to dismiss is a bright-line, 180-day interval before refiling. This interval gives creditors room to act. *In re Nelkovski*, 46 B.R.

at 544; *see also*, *Richardson*, 217 B.R. at 492 (cautioning that even evidentiary hearings may not always result in "unerringly detecting the will of the debtor").

*Payton* rejected the mandatory sequential view by pointing to the Code's policy of "affording relief to honest debtors." 481 B.R. at 467, citing *Marrama v. Citizens Bank*, 549 U.S. 365, 367 (2007). But *Payton* stops short. *Marrama* relied on *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991), where the Court identified "*a* central purpose of the Code" is to give relief to honest debtors. But the *Grogan* court also was "careful to explain that the [Code] limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'" *Id.* Minimizing creditors' losses from defaults is another, valid aim of the Code. *Jendusa-Nicolai v. Larsen,* 677 F.3d 320, 324 (7th Cir. 2012). Section 109(g)(2) strikes a balance in promoting both goals, without the need for a subjective inquiry into causation.

The *Payton* court perceived that the statutory purpose of curbing abusive filings "will frequently not be advanced" by simply confirming that the voluntary dismissal was requested and granted after the filing of a motion for relief from stay. *Payton* offers some examples where the two events may not have a causal relationship, 481 B.R. at 466, but cannot quantify the frequency of such examples. That work, and devising a policy to address it, belongs to Congress. *Law v. Siegel*, 134 S.Ct. 1188, 1197–98 (2014) (explaining it is not for the courts to alter the balance between debtor and creditor interests struck by the Code); *see also*, Kimberly Nelson, Note, *Abusive Filings: Can Courts Stop the Abuse within the Confines of the Bankruptcy Code?,*17 Bankr. Dev. J. 331, 340, & n.28, 361, & n.114 (2000) (noting that because the refiling bar of section 109(g)(2) is triggered by only certain specific events, its effectiveness is limited and courts have used other sections of the Code to employ discretion in adding a refiling bar onto an order dismissing an abusive petition).

*Payton's* fear that the sequential approach will lead to harsh or absurd results focuses on exceptional cases, and disregards the canon that courts must allow Congress to enact blunt instruments, even when a finer tool would suffice, so long as the result is not unconstitutional. *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982) (explaining that the court must apply the law as Congress wrote it, unless the result is absurd, bizarre, or "demonstrably at odds with the intentions of its drafters").

Courts should hesitate to find "absurdities" too readily. The canon against absurdities should be employed only "where the result of applying the plain language would be, in a genuine sense, absurd, i.e., where it is quite impossible that Congress could have intended the result . . . and where the alleged absurdity is so clear as to be obvious to most anyone." *Public Citizen v. Department of Justice*, 491 U.S. 440 470–71 (1989) (Kennedy, J., concurring in

judgment). A careful study of, and allegiance to, the text of section 109(g), prevents this court from concluding that "following" means "as a result of," or that such an interpretation best advances the purpose of the statute. Nor does the sequential approach render section 109(g)(2) unconstitutional or bizarre; it simply serves the purpose of section 109(g)(2) in a more inclusive manner, rendering ineligible both debtors who intentionally and unintentionally frustrated their creditors' rights. *See Guerrero*, 540 B.R. at 280.

"Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993) (*citing Perrin v. United States*, 444 U.S. 37, 42 (1979)). Whatever definition of "following" one adopts, the common ground is a chronological, or sequential, meaning: one event must follow another. *See Payton*, 481 B.R. at 464 n.2. The sequential approach clearly defines a debtor's legal rights going forward, furthers the purpose of section 109(g)(2), and is an efficient use of judicial and party resources. The best way to read "following" is "after."

### c. The text of section 109(g)(2) does not afford courts discretion to waive its application.

Mr. and Mrs. Gibas argue against the discretionary approach. (Chapter 11 Case Doc. No. 33 at 4–5.) This court agrees that the discretionary approach adds a layer of judicial deliberation not authorized by the statutory text. Some contrasting examples help clarify this view.

Congress has drafted a number of Code provisions directing courts to employ their discretion. *See, e.g.,* § 109(h)(3)(A)(iii) ("[T]he requirements of [receiving credit counseling during the 180-day period ending on the petition date] shall not apply with respect to a debtor who submits to the court a certification that— . . . *is satisfactory to the court.*") (emphasis added); § 362(c)(3)(B) ("[T]he court *may* extend the stay in particular cases . . . only if the party in interest demonstrates that the filing of the later case is *in good faith* as to the creditors to be stayed.") (emphasis added); § 362(c)(3)(C)(i)(III) (a case is presumptively filed not in good faith "as to all creditors, *if*— . . . *there has not been a substantial change* in the financial or personal affairs of the debtor since the dismissal of the next most previous case") (emphasis added).

Application of section 109(g)(2) does not require the same degree of judicial analysis as these examples. The section does not direct the court to consider particular circumstances when applying the statute, nor does it set out a test for good faith, or even use words like "may" that authorize judicial discretion. Instead, section 109(g)(2) merely prescribes that when a particular sequence of events occurs, including the debtor's voluntary filing of a request

to dismiss, the debtor is ineligible to refile for 180 days. This court declines to add more conditions to section 109(g)(2) than what its text directs. *Lamie v. U.S. Trustee*, 540 U.S. at 538, instructing that courts should not read absent words into a statute, and citing *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978), "there is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted." (citations omitted).

True, our district court endorsed the discretionary approach a decade ago. *In re Beal*, 347 B.R. 87 (E.D. Wis. 2006). The *Beal* court generally agreed with a plain, sequential interpretation of section 109(g)(2), but identified several circumstances where courts should decline to enforce the 180-day prohibition for filing a new case. 347 B.R. at 93. None of those circumstances were directly or indirectly identified in the text of section 109(g)(2). The *Payton* court acknowledged as much. 481 B.R. at 467 ("the difficulty with this approach . . . is that nothing in the language of § 109(g)(2) grants judicial discretion in its application"); *accord*, *McDougall v. Bell Transit Co.*, 22 F.3d 706, 710 (7th Cir. 1994) ("we are . . . not free to carve out our own exceptions merely because we believe that they would best serve Congress' policies and goals"). A year after *Beal*, our district court affirmed an application of 109(g)(2) to hold a person ineligible to be a debtor where she had voluntarily dismissed her prior case immediately after a creditor was granted relief from the stay. *In re Yancey*, No. 07-C-1063, 2008 WL 150654 (E.D. Wis. Jan. 11, 2008). Both the *Yancey* bankruptcy and district courts simply considered the requisite sequence, making no mention of *Beal*, discretion or causal relationship. Because the discretionary approach of *Beal* improperly "adds words" to the statute, *see G.E. Betz*, 718 F.3d at 624–25, this court respectfully declines to follow it.

### 2. Section 109(g)(2) Applies to the Gibases, Rendering Them Ineligible to Be Debtors in this Case.

Applying section 109(g)(2) to the facts of record is straightforward. During Mr. and Mrs. Gibas's last case, U.S. Bank, N.A. moved for relief from the automatic stay as to their Fontana, Wisconsin homestead. U.S. Bank filed its motion on July 14, 2015, at 10:16 a.m. (2015 Chapter 13 Case Doc. No. 26.) That same day, at 4:43 p.m., Mr. and Mrs. Gibas requested that their case be voluntarily dismissed. (2015 Chapter 13 Case Doc. No. 27.) No one opposed the debtors' motion, so on July 20, 2015, the court dismissed their case. (2015 Chapter 13 Case Doc. No. 28.) With few exceptions, section 1307(a) mandates that the court grant a debtor's request to dismiss his case.[13] Because the

---

[13] 11 U.S.C. section 1307(a)(2014) provides: "On request of the debtor at any time, if the case has not been converted under section 706, 1112, or 1208 of this title, the court shall dismiss a case under this chapter. Any waiver of the right to dismiss sunder this subsection is unenforceable." Exceptions to this right of dismissal can include bad faith conduct or abuse of

petitioners requested and obtained the voluntary dismissal of their case following—i.e., after—U.S. Bank, N.A. moved for relief under section 362, both Larry and Kimberly Gibas became ineligible for bankruptcy relief for 180 days from the dismissal order. § 109(g)(2). One-hundred and eighty days from July 20, 2015, is January 19, 2016. Accordingly, when the petitioners filed this case on October 2, 2015, they were ineligible for bankruptcy relief. This case must be dismissed.

Even if this court were to adopt the causal or the discretionary approach, Mr. and Mrs. Gibas would not be eligible for relief under the Code. Their egregious pattern of repeated case filings and extended delay of relief to secured creditors establishes a causal relationship, and eliminates any possibility that dismissing this case would be an absurd or too-harsh result.

The petitioners deny that the filing of U.S. Bank's motion for relief caused them to voluntarily dismiss their case. Instead, they assert they voluntarily dismissed when they learned that they were over the chapter 13 debt limits. (Chapter 11 Case Doc. No. 11 at 1; No. 33 at 9.) But the court's order of voluntary dismissal does not reflect this rationale. (2015 Chapter 13 Case Doc. Nos. 27 & 28.) And the petitioners offered no testimony as to when they learned they were over those limits. Larry testified, and the record reflects, that the purpose of this bankruptcy case was to prevent confirmation of the foreclosure sale on their Fontana, Wisconsin homestead. (Chapter 11 Case Doc. No. 14.) The petitioners' pattern of repeated filings, case non-compliance, and deliberate gap between the July 20 dismissal and October 2 "expedited" filing, manifest that the purpose of their prior dismissal was to buy time to reimpose the automatic stay triggered by filing this case—a form of instant, if temporary, relief with which Larry and Kimberly were well-acquainted.

If the court were to adopt the causal approach to section 109(g)(2), it would conclude that the petitioners requested and obtained the voluntary dismissal of their 2015 Chapter 13 case because U.S. Bank, N.A. filed a motion for relief from stay. Given this clear causal relationship, Mr. and Mrs. Gibas would be ineligible for bankruptcy relief for 180 days.

The same factual patterns would render Larry and Kimberly ineligible under the discretionary approach. Under that approach, the court must be satisfied that the couple commenced this case in good faith. While the petitioners argue that they filed this case with a valid purpose under the Bankruptcy Code—to pay off their Wisconsin mortgage and federal tax debt— little to nothing in their case history supports that intent. Larry and Kimberly Gibas made no plan payments in any bankruptcy case since (at least) 2011.

---

the bankruptcy process. *See, e.g., In re Molitor*, 76 F.3d 218 (8th Cir. 1996); *In re Rosson*, 545 F.3d 764 (9th Cir. 2008).

U.S. Bank's motion for relief from stay in the 2015 Chapter 13 Case reflects that the couple made no post-petition mortgage payments during that case. Totally absent here are the unintended results that prompt some courts to apply the discretionary approach interpreting section 109(g)(2). Instead, this case is an exemplar of the creditor abuse Congress sought to prevent by enacting section 109(g)(2).[14]

## D.    Continuation and Imposition of the Stay

Because the court has determined that Mr. and Mrs. Gibas are ineligible for bankruptcy relief under section 109(g)(2), the court need not decide whether to continue the conditional stay as to Mr. Gibas or to impose the stay as to Mrs. Gibas. Even if they were eligible for bankruptcy relief, however, the court would conclude that neither petitioner is entitled to the stay protection afforded by section 362(a) because Larry and Kimberly Gibas have failed to demonstrate that they filed the current case in good faith as to their creditors to be stayed.

### 1.    Mr. Gibas's Motion to Continue the Stay

When a debtor has had one prior case dismissed within the last year, the automatic stay of section 362(a) expires 30 days after the debtor files the new case, unless the court extends the stay upon a finding that the debtor filed the most recent case in good faith as to his creditors to be stayed. 11 U.S.C. § 362(c)(3)(A) & (B). Under section 362(c)(3)(C), a rebuttable presumption that the debtor's current case was filed *not in good faith* arises in certain circumstances. Applicable here, the presumption arises as to all creditors if "there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under chapter 7, 11, or 13 or any other reason to conclude that the later case will be concluded . . . if a case under chapter 11 or 13, with a confirmed plan that will be fully performed." 11 U.S.C. § 362(c)(3)(C)(i)(III). The presumption also arises as to any specific creditor who moved for relief from the automatic stay "in a

---

[14] The court in *In re Holder*, 151 B.R. 725, 727 (Bankr. D. Md. 1993), described a typical sequence of events targeted by section 109(g)(2):

> Section 109(g)(2) deals with voluntary dismissals and subsequent refilings which effectively act to prevent creditors from acquiring relief from the automatic stay and pursuing foreclosure remedies in state court proceedings. Customarily in such cases, a debtor's bankruptcy petition is filed to forestall a threatened foreclosure. Once the foreclosure is stopped, debtors either do not, or cannot, properly prosecute the case, or they move to dismiss the case after a motion for relief from stay has been filed. The purpose of the 180-day period in Section 109(g) is to allow creditors holding secured claims . . . a window of opportunity to exercise their rights under state law free of the constraints of the bankruptcy law. Otherwise, debtors could file and dismiss cases at will, free to interdict all foreclosure efforts, and having succeeded, thereafter to cease to prosecute their cases or to dismiss them and refile when foreclosure again threatens.

previous case in which the individual was a debtor if, as of the date of dismissal of such case, that action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to actions of such creditor." 11 U.S.C. § 362(c)(3)(C)(ii). It is the debtor's burden to prove that his or her case was filed in good faith.

Now having had the opportunity to review the couple's multi-case history, the court has serious doubts about Larry Gibas's willingness or ability to confirm and perform a chapter 11 plan. That history shows Larry never made a single payment in his three chapter 13 cases initiated since 2013. The court also questions whether Larry's financial or personal affairs have substantially changed since the dismissal of his prior case. Nevertheless, the court will assume for this analysis that the presumption of bad faith does not arise as to all of Larry's creditors under section 362(c)(3)(C)(i)(III). But the presumption does arise as to U.S. Bank under section 362(c)(3)(C)(ii) because the Gibases voluntarily dismissed their prior case while U.S. Bank's motion for relief from stay was pending. To obtain an order continuing the stay, Larry must therefore prove that he filed this case in good faith as to U.S. Bank by clear and convincing evidence, and as to all other creditors by a preponderance of the evidence. 11 U.S.C. § 362(c)(3)(C); *In re Galanis,* 334 B.R. 685, 698 (Bankr. D. Utah 2005); *see also In re Furlong,* 426 B.R. 303, 308–09 (Bankr. C.D. Ill. 2010). "Evidence is clear and convincing if it leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question, and proof by a preponderance of the evidence means that the trier of fact must believe that it is more likely than not that the evidence establishes the proposition in question." *In re Meyers,* 616 F.3d 626, 631 (7th Cir. 2010) (internal citations and quotation marks omitted).

The Bankruptcy Code does not define "good faith." The Seventh Circuit has yet to analyze the concept in relation to section 362(c), but has explored "good faith" in relation to a motion to dismiss under section 1307(c). *See Matter of Love,* 957 F.2d 1350 (7th Cir. 1992). In *Love,* the Seventh Circuit directed bankruptcy courts to look at the "totality of circumstances" in determining whether a chapter 13 case was filed in good faith. *Id.* at 1355. The court set forth several factors to consider in the analysis, including: the timing of the petition; how the debt arose; the debtor's motive in filing the petition; and how the debtor's actions affected creditors. *Id.* at 1357. Bankruptcy courts in other jurisdictions have adopted and supplemented the *Love* factors in analyzing good faith under section 362(c), also considering why the debtor's prior case was dismissed (including the debtor's conduct in that case); the likelihood that the debtor will have a steady income throughout the bankruptcy case and whether he can properly fund a plan (and whether the debtor's circumstances have changed since the prior dismissal); and whether the trustee or creditors

have objected to the debtor's motion. *See, e.g.*, *In re Baldassaro*, 338 B.R. 178, 188 (Bankr. D.N.H. 2006); *In re Havner*, 336 B.R. 98, 103–04 (Bankr. M.D.N.C. 2006); *In re Galanis*, 334 B.R. 685, 693 (Bankr. D. Utah 2005); *In re Montoya*, 333 B.R. 449, 457–58 (Bankr. D. Utah 2005); *see also In re Ferguson*, 376 B.R. 109, 119–25 (Bankr. E.D. Pa. 2007) (enumerating factors identified by courts to evaluate good faith under section 362(c)); *Fed. Nat. Mortgage Ass'n v. Bruckner*, 489 B.R. 93, 101 (E.D. Wis. 2012) ("There is no particular test for determining whether a debtor has filed a Chapter 11 petition in good faith; rather, the bankruptcy court has the discretion to evaluate the totality of the circumstances in each case to determine whether the petition was filed in good faith.").[15]

Whatever particular factors the court considers, the essential inquiry is the same: has the debtor demonstrated both subjective and objective good faith? The subjective component requires the debtor to prove that the case was filed for a proper purpose. The objective component requires the debtor to prove that the case is likely to result in a bankruptcy discharge. When the debtor is a serial filer, the subjective component assumes a more critical role in the inquiry; no matter how feasible a plan appears on paper, it cannot succeed if the debtor has neither the intent nor the willingness to complete it. Therefore, a debtor's conduct in prior cases is a valid consideration in determining whether the present action is a legitimate effort to repay creditors or an abuse of the bankruptcy process. The past may very well be prologue in this respect.[16]

Here, Larry Gibas's filing history is significant. This is his fourth case in less than three years. His prior three cases were dismissed—two involuntarily and one voluntarily—after he failed to file required documents, disclose required information, attend a meeting of creditors, or make plan payments. Each case also was filed on the eve of foreclosure action (regarding either the South Barrington property or the Fontana property) to thwart a mortgage

---

[15] Although some courts have focused on different factors in considering dismissals for lack of good faith in chapter 11 business cases, the court finds the above factors applicable in this individual chapter 11 case. *See, e.g.*, *In re Liptak*, 304 B.R. 820, 829 (Bankr. N.D. Ill. 2004) ("The Seventh Circuit's case law concerning dismissal for lack of good faith in Chapter 13 cases under § 1307 is also relevant [in this Chapter 11 case] because an *individual* Chapter 11 case is really just a debtor-controlled alternative to a Chapter 13 case, and the individual aspects of this Chapter 11 case predominate over any business aspects that may be present here.") (*citing Matter of Love*, 957 F.2d 1350, 1356 (7th Cir.1992) ("[T]he good faith analyses differ under Chapter 11 and Chapter 13 because businesses and individuals are obviously different.")).

[16] "Whereof what's past is prologue, what to come/ In yours and my discharge." WILLIAM SHAKESPEARE, THE TEMPEST act 2, sc. 1. The court can determine that a debtor filed a case in bad faith based on a pattern of conduct, and may impute bad faith from the timing and circumstances of the filing. *Eisen v. Curry*, 14 F.3d 469, 470–71 (9th Cir. 1994). The court also may consider the filings and acts of family members when determining the bad faith of a debtor. *In re Craighead*, 377 B.R. 648, 655 (Bankr. N.D. Cal. 2007).

holder's attempts to enforce its foreclosure rights. While the foreclosure actions were (repeatedly) stayed pending bankruptcy, neither the mortgage lenders nor any other secured creditors received distributions from a chapter 13 plan because Larry made no plan payments during any of his cases. He did, however, pay his various bankruptcy attorneys.

There is no evidence that Larry Gibas intended to complete a chapter 13 plan or obtain a discharge in any of his prior cases. If Larry were serious about obtaining reorganization relief, rather than simply, repeatedly, forestalling foreclosure action, the court would have expected him to file all of the required documents (and to ensure that they were complete and accurate), attend the required meetings, and make the required payments. That none of his prior cases lasted longer than three months is telling. Larry has not successfully prosecuted any of his cases, even through confirmation. Taken together, all of this evidence suggests Larry Gibas filed his prior bankruptcies to invoke the protections of the automatic stay and frustrate his mortgage lenders' attempts to exercise their foreclosure rights, rather than to pay off creditors via the relief afforded by chapter 13.

The same can be said for this case. Mr. Gibas admitted that the specific purpose of this chapter 11 case was to stop the confirmation of the sheriff's sale on his and his wife's Fontana property. He said virtually nothing about a desire to pay creditors. *See Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012), reminding that relief to honest debtors is "*a* principal purpose—another is to minimize creditors' losses from defaults."

Also, Larry has displayed a cavalier attitude toward the bankruptcy process, making little to no effort to ensure the completeness and accuracy of his bankruptcy filings. The court may consider this behavior as part of its good faith analysis: "A debtor's lack of candor or completeness in filing schedules is certainly an indication of bad faith." *In re Jakovljevic-Ostojic*, 517 B.R. 119, 127 (Bankr. N.D. Ill. 2014) (internal citations omitted).

Although the Gibases' present attorney recited facts that could weigh in favor of a finding of good faith—such as the lack of objection from U.S. Bank—those few facts cannot sustain Mr. Gibas's burden of demonstrating good faith. What's more, several cut against Larry when viewed in light of his prior, late-discovered, conduct. Filing for bankruptcy to save one's home from foreclosure can be a valid and proper use of the Bankruptcy Code, as petitioners' counsel asserts. But it is *not* a proper use of the Code to repeatedly file, and then fail to prosecute, bankruptcy cases on the eve of foreclosure action, as this couple has done. Similarly, petitioners' counsel asks the court to give weight to the fact that the couple paid him a significant retainer fee prior to filing this case. While this outlay could indicate Larry and Kimberly's intent to "stick with it"

this time, the court views the retainer as just one more instance of the petitioners preferring to pay their attorneys over their creditors.

Finally, the court is not convinced that Larry and Kimberly are likely to confirm and perform a plan simply because they have surrendered their larger, more expensive property and chosen to make their comparatively more modest, vacation home their current homestead. The Gibases have been unwilling or unable to complete any of their prior proposed reorganization plans. Upon review of the record,[17] it is difficult for the court to conclude that the debtors can pay off their significant debts, particularly because of their failure to make plan payments in prior cases, where their reported net monthly income was higher than they now report.

Based on the totality of circumstances, the court finds that Larry Gibas has failed to prove by clear and convincing evidence he filed this case in good faith as to U.S. Bank, and to prove by a preponderance of the evidence he filed this case in good faith as to all other creditors. The court therefore denies Mr. Gibas's motion to continue the stay.

### 2. Mrs. Gibas's Motion to Impose the Stay

When a debtor has had two or more prior cases dismissed within the last year, the automatic stay does not go into effect when the debtor files a new case. 11 U.S.C. § 362(c)(4)(A). Instead, the debtor must ask the court to impose the stay and prove that the current case was filed in good faith as to her creditors to be stayed. 11 U.S.C. § 362(c)(4)(B). A rebuttable presumption that the debtor's current case was filed *not in good faith* arises as to all creditors if "2 or more previous cases under this title in which the individual was a debtor were pending within the 1-year period" prior to the filing of the current case. 11 U.S.C. § 362(c)(4)(D)(i)(I).

Before filing this case, Kimberly Gibas had two cases that were pending and dismissed within the prior year, so the presumption of bad faith arises as to all of her creditors under section 362(c)(4)(D)(i)(I). To obtain an order imposing the stay, Kimberly Gibas must prove by clear and convincing evidence that she filed this case in good faith as to all creditors to be stayed. 11 U.S.C. § 362(c)(4)(D). Despite her high burden, Mrs. Gibas offered little evidence of her good faith. She submitted no affidavit in support of her motion to impose the stay, nor did she testify to support her motion—instead, she testified only when called adversely by the attorney for the U.S. Trustee.

---

[17] Several weeks after the hearing on these motions, and before release of this Decision, the Gibases filed monthly operating reports through October 2015 and through December 10, 2015. (Chapter 11 Case Doc. No. 55.) That information does not change the outcome of this Decision.

Based on the woeful lack of evidence as to Kimberly's good faith, and for the same reasons the court denied Larry Gibas's motion to continue the stay, the court also must deny Kimberly Gibas's motion to impose the stay. Kimberly's filing history is similar to her husband's, if not more egregious.[18] This is her sixth case in just over four years. In her prior cases, Kimberly failed to file required documents, disclose required information, or attend meetings of creditors. The record manifests that her prior cases delayed foreclosure actions while making no plan payments to secured creditors. Most significant, the 2015 Chapter 13 Case was filed in direct violation of the Illinois bar order. Based on the totality of circumstances, including those previously discussed regarding Larry's motion to continue the stay, the court finds that Kimberly Gibas has failed to prove by clear and convincing evidence she filed this case in good faith as to her creditors to be stayed. The court therefore denies her motion to impose the stay.

### E.    One-Year Bar to Refiling

A bankruptcy court may, on its own motion, bar a debtor from future bankruptcy filings under sections 349(a) and 105(a). *See In re Dilley*, 125 B.R. 189, 198 (Bankr. N.D. Ohio 1991) ("[T]here is nothing in the Code which would precluded sua sponte action by the Court. Section 349(a) appears to contemplate sua sponte action. Section 105(a) expressly provides for sua sponte action by the court, even where other parties are expressly charged with raising a matter.").[19] Section 349(a) allows the court to bar successive bankruptcy filings for "cause":

> Unless the court, for cause, orders otherwise, the dismissal of a
> case under this title does not . . . prejudice the debtor with regard

---

[18] The court's only reluctance to find Kimberly's actions more egregious than those of Larry Gibas is the evidence that Larry was the driver behind each of the cases filed, whether Kimberly or Larry was the named petitioner. Larry was the one in contact with the various bankruptcy lawyers, it was Larry's work travel that seemed to dictate when schedules finally were completed, and it was Larry, not any lawyer, who placed documents in front of Kimberly for her to sign.

[19] The court's order to show cause did not raise the possibility of a refiling bar, but the Gibases were put on notice that their "bad faith" was at issue when CIT filed its objection to their motion to continue the stay, and later, at the December 1 evidentiary hearing, when the U.S. Trustee's attorney argued that the couple filed the present case in bad faith and as an abuse of the bankruptcy process. The Gibases had a full and fair opportunity to respond to those claims, both in their briefings and during the evidentiary hearing. Because the court's decision to issue a refiling bar rests on the same facts and legal arguments the parties have already addressed (and which the U.S. Trustee has again raised in a separate motion to dismiss with a refiling bar, *see* Chapter 11 Case Doc. No. 54), no further briefing is needed for the court to determine whether dismissal should be with prejudice. *See B-3 Properties, LLC v. Lasco (In re B-3 Properties, LLC)*, 517 B.R. 889, 897–99 (N.D. Ind. 2014) (debtor had sufficient notice to be permanently barred from refiling where a creditor's motion alleged bad faith and the court received oral argument on the motion).

to the filing of a subsequent petition under this title, except as provided in section 109(g) of this title.

11 U.S.C. § 349(a). And section 105(a) empowers the court to issue orders to prevent abuses of the bankruptcy process:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

A majority of courts have concluded that the text of section 349(a), "unless the court, for cause, orders otherwise," does not limit the court to imposing refiling bars of 180 days or less., *See, e.g., Casse v. Key Bank Nat'l Assoc. (In re Casse)*, 198 F.3d 327, 336 (2d Cir. 1999); *Dietrich v. Nob-Hill Stadium Props. (In re Dietrich)*, No. 05-2255, 2007 WL 579547, at *4–5 (6th Cir. Feb. 15, 2007). The Tenth Circuit takes a different position, viewing section 349(a) to limit refiling bars to the 180 days imposed by section 109(g)(2). *Frieouf v. United States et. al. (In re Frieouf)*, 938 F.2d 1099, 1102–04 (10th Cir. 1991). But the Seventh Circuit has upheld a bankruptcy court's refiling bar of greater than 180 days, *see B-3 Properties*, 517 B.R. at 897 (*citing In re Dempsey*, 247 Fed. Appx. 21, 25, 2007 WL 2478674, at *4 (7th Cir. Aug. 31, 2007) (one-year bar upheld)), and has acknowledged generally that a bankruptcy court may "exercise its equitable powers in a manner consistent with the Code," *In re Lloyd*, 37 F.3d 271, 275 (7th Cir. 1994) (applying section 105(a)). Therefore this court will adopt the majority view of section 349(a) as a more natural reading of the statute, aligned with Seventh Circuit precedent.

Based on the record, cause exists under section 349(a) to dismiss this case with prejudice and bar the Gibases from seeking relief under Title 11 for a period of one year. Such action is necessary to prevent further abuse of the bankruptcy process. Larry and Kimberly Gibas have repeatedly and unfairly manipulated the Bankruptcy Code by filing numerous bankruptcy cases to obtain protection of the automatic stay, without intending to prosecute those cases through plan confirmation, completion, and discharge. A one-year bar is also appropriate here given that Mrs. Gibas has already violated a 180-day bar order imposed by the Bankruptcy Court for the Northern District of Illinois.

# V.    CONCLUSION

Saving one's home is, for many persons, a valid reason to file a bankruptcy case. That validity dims as successive cases are dismissed and re-filed, without payment to creditors and without full required disclosures. The initial validity evaporates in the face of a deliberate pattern of Code manipulation, false statements and outright flaunting of court orders.

Based on the dictate of section 109(g) that these petitioners were ineligible for bankruptcy relief on October 2, 2015, because they voluntarily dismissed their prior case following a creditor's motion for relief from stay, their case will be dismissed. Alternatively, had the court concluded the Gibases were in fact eligible to be debtors, it would have denied continuation of the conditional stay for Larry Gibas and refused to impose the stay as to Kimberly Gibas, because of their lack of good faith over a 4-plus year history of manipulating the Bankruptcy Code to thwart foreclosure on two different residences, without payment to creditors and without candor to the courts. Moreover, their continuous loop of filings and dismissals, with repeated incomplete and false information, without regard for presenting a workable payment plan for secured creditors and in defiance of a prior bar order, constitutes bad faith and compels this court to impose a one-year bar on refiling any case under Title 11 of the United States Code by either Larry or Kimberly Gibas.

The court will enter a separate order in accordance with this decision dismissing this case and barring Larry and Kimberly Gibas from refiling for bankruptcy relief under Title 11 for the period of one year.

# # # # #